ELMER HAASE v. STOKELY-VAN CAMP, INC.

99 N. W. (2d) 898.

December 4, 1959—No. 37,582.

[2]See, Dworsky v. Herbst, 254 Minn. 295, 95 N. W. (2d) 19; Gulbrandson v. Empire Mutual Ins. Co. 246 Minn. 523, 75 N. W. (2d) 593.

*Daniel I. D'Amico* and *T. Frank Quinn,* for appellant.
*Thoreen, Thoreen & Lawson,* for respondent.

KNUTSON, JUSTICE.

This is an appeal from an order of the trial court denying defendant's alternative motion for judgment notwithstanding the verdict or a new trial.

On April 12, 1957, plaintiff, a farmer in Washington County, and defendant executed a written contract under the terms of which plaintiff agreed to plant and grow a crop of sweet corn which defendant agreed to purchase under the terms of the contract. Pertinent portions thereof are as follows:

"1. Elmer Haase of Lake Elmo (hereinafter known as the grower) hereby agrees to plant, grow, harvest, and deliver; and Stokely-Van Camp, Inc., (hereinafter known as the Company) agrees to purchase the crop from 40 acres[1] of Sweet Corn during the 1957 season and subject to the terms of this agreement.

"2. Compensation:

"(a) The Company agrees to pay for all usable sweet corn delivered in the husk under this agreement, the following prices:

"For ———— variety $16.00 per ton

＊  ＊  ＊  ＊  ＊

"(b) If any or all of the acreage covered by this agreement must be passed, the Company agrees to pay 60% of the stated price for sweet corn delivered to its factory. ＊ ＊ ＊

"Passed acreage is defined as contracted acreage, the crop from which was not delivered because of the failure of the Company to order, schedule, or permit delivery during a period of acceptable condition as described in the contract; and when the providential release

---

[1] The acreage was increased later by mutual agreement.

clause of the contract is not applicable. Crops not delivered during a period of acceptable condition due to the unwillingness or inability of the grower, and for which reasonable delivery orders or schedules have been provided, shall not be considered as passed acreage.

\* \* \* \* \*

"3. Grading:

"(a) Sweet corn will be graded by a Company representative.

"(b) Usable sweet corn shall be defined as ears of sweet corn in the husk, snapped close to the ear, at least 5 inches long, 95% filled with kernels, in a milky stage and suitable for preparing fancy canned sweet corn. Ears not meeting these requirements, or smutty or damaged by insects; and excessive shanks, stalks or other extraneous material will be considered as waste and deducted from the weight of the load.

\* \* \* \* \*

"4. Seed.

"(a) The Company agrees to furnish seed required under this agreement, charging the grower's account 25c per pound of seed supplied. \* \* \*

\* \* \* \* \*

"5. Harvesting and Delivery.

"(a) It is mutually agreed that the deliveries shall be made to the Company's factory in such manner, condition and time as the Company may direct.

"(b) In the event that the grower needs labor, or use of a mechanical picker, to harvest the crop, the Company will endeavor to provide or arrange such assistance. In case the grower desires assistance in hauling the crop to the Company's factory, the Company will endeavor to arrange hauling.

\* \* \* \* \*

"(d) If, for any reason, the grower fails to harvest and deliver the crop as directed by the Company, the Company shall have the right to harvest and deliver the crop and charge the cost to the grower's account.

"6.   Production Conditions:

\* \* \* \* \*

"(d)   The Grower agrees to permit Company representatives to enter and inspect acreage covered in this agreement.

"7.   Providential Release:

"It is mutually agreed that the obligation of either party to perform any executory provisions or obligations of this contract is qualified by the inability of either party to perform on account of fire, strikes, lockouts, acts of God, war, orders of a duly constituted government authority, or other causes not within the control of the parties."

Pursuant to this contract, defendant furnished seed for planting a crop of sweet corn on plaintiff's land. Several separate fields were planted at various intervals. Defendant controls the time of planting in order that, as far as possible, the corn will reach the proper stage of maturity for processing at different times so that the plant will not be flooded with corn all at one time. Plaintiff's fields were designated at the trial as fields A, B, C, D, and E. Field A, which is the one involved in this litigation, was planted early in May. Because of weather conditions, the germination was so poor that it was decided in June to reseed the field. Seed accordingly was again furnished by the company, and the field was disced, harrowed, and reseeded. As a result of the discing of the field preparatory to the second planting, some of the corn which had fallen to the ground from a crop of field corn grown in 1956 was brought near enough to the surface so that it germinated and became mixed with the sweet corn.

Plaintiff's fields were inspected by defendant's fieldmen during the summer of 1957. Defendant claims that there was so much field corn mixed in with the sweet corn in field A that the corn was unusable for canning purposes, in that it would be expensive to sort it after it was picked. There is a sharp dispute in the testimony of the witnesses as to what took place in September when the corn began to reach the state of maturity and it was essential that it be harvested if it was to be used for canning purposes, but it stands admitted that defendant's representatives said nothing about rejecting the field for the reason that it contained too much field corn until at least the middle, or

possibly the latter, part of September. Plaintiff's testimony is that on September 15 defendant's fieldman said:

"* * * there was so much corn, that I should pick all I could and sell it because he didn't know if they could get around because there was corn there yet for three or four weeks of picking."

Thereafter, plaintiff did pick a few acres of the sweet corn and sold it on the market in St. Paul, but it had already reached such a stage of maturity that it was difficult to dispose of it for table use. It is admitted that corn can be used for canning purposes at a stage of maturity later than it is desirable for table use.

Defendant moved its cornpicking machinery to plaintiff's farm on September 21 and then proceeded to pick the corn on fields other than field A, which they later rejected. Even at that time, while defendant's representatives claim that they had decided to reject the field because it had too much field corn in it, they did not convey that information to plaintiff.

It would have been possible to have eliminated the field corn by going through the field and knocking the cobs off or by breaking down the field-corn stalks so that the mechanical picker could harvest the sweet corn without also harvesting the field corn with it. It also would have been possible to pick the corn by hand. Field corn and sweet corn are easily distinguishable in the field. However, plaintiff was never asked to deliver or pick the corn or to eliminate the field corn so that the sweet corn could be picked without also picking the field corn.

It is also admitted that there was some field corn in field C, but not as much as in field A. The corn in field C was picked and accepted by defendant.

The corn in field A was a total loss to plaintiff since it had to be destroyed because of regulations of the soil bank program, which governed plaintiff's operation of his farm.

The parties stipulated the amount of damages which plaintiff would be entitled to recover if he was entitled to recover at all. The jury returned a verdict for plaintiff. While there are a number of assignments of error, the only question presented for our determination is

whether, under the facts of this case, defendant was entitled to reject the sweet corn grown in field A under and by virtue of M. S. A. 512.11(2) and 512.44(3).

It is defendant's contention that the contract entered into between it and plaintiff was an executory contract for a sale by description of specified goods governed by provisions of our Sales Act and, consequently, that the court erred in submitting to the jury the doctrine of substantial performance. The pertinent portions of our Sales Act relied upon by defendant are § 512.11(2), which reads as follows:

"Where the property in the goods has not passed, the buyer may treat the fulfillment by the seller of his obligation to furnish goods as described and as warranted expressly or by implication in the contract to sell as a condition of the obligation of the buyer to perform his promise to accept and pay for the goods";

§ 512.76(1), which as far as material reads:

" 'Goods' include all chattels personal other than things in action and money. The term includes * * * industrial growing crops, and things attached to or forming part of the land which are agreed to be severed before sale or under the contract of sale";

and § 512.44(3), which reads:

"Where the seller delivers to the buyer the goods he contracted to sell mixed with goods of a different description not included in the contract, the buyer may accept the goods which are in accordance with the contract and reject the rest, or he may reject the whole."

The fallacy of defendant's position lies in the assumption that there was an attempted delivery of specified goods mixed with other goods not conforming to the contract. Under the terms of this contract defendant had control of the manner, condition, and time of delivery. Plaintiff could not deliver until instructed to do so by defendant. Defendant never gave plaintiff an opportunity to deliver corn that would conform to the contract. Furthermore, the above provisions do not apply here because this contract contemplates something more than the sale of specified described goods. It involves the growing and delivery of a crop which was under almost complete control of defendant. The

contract contains reciprocal rights and duties of both parties. Defendant inspected the crop on several occasions during the summer and knew, long prior to the time when the crop was ready for delivery, that some field corn was growing in the field. If it intended to reject the crop on that account, it was incumbent upon it to so notify plaintiff in time so that he could either dispose of the crop elsewhere or eliminate the field corn so that the crop would conform to the contract. Defendant did nothing until it was too late to make use of the crop. In a contract of this kind, good faith on the part of both contracting parties must be implied.[2] Where one of the contracting parties makes it impossible for the other to perform, he should not be permitted to take advantage of his own action in so doing.[3] In this case the jury was amply justified in concluding that delivery was not ordered by defendant—because it had more corn than it could handle—until the corn in field A had become too ripe and that, as a consequence, it was liable under the contract for passed corn. Under these circumstances, no prejudice resulted from the court's instructing the jury on the doctrine of substantial performance in the form in which it did.

Defendant relies mainly on Haase v. Nonnemacher, 21 Minn. 486, and Vassau v. Campbell, 79 Minn. 167, 81 N. W. 829. Both cases are clearly distinguishable from the one now before us. In the Haase case, plaintiff agreed to sell and ship to defendant tobacco of a specified kind. He shipped goods of an inferior quality. While this court recognized that under such a contract the seller must, in the performance on his part, furnish goods of the kind and quality called for by the description or the purchaser need not accept them, we also recognized that, when the buyer has ascertained the quality, he must notify the seller of any objection he may have so as to give the seller an opportunity to take the goods back, or, if he keeps them without objection after he has ascertained the quality, he will be deemed to have acquiesced in it, as in accordance with the contract. As applied to this case, we might reason by analogy that before defendant can reject the

---

[2] See, Stern v. Mayer, 166 Minn. 346, 207 N. W. 737, 46 A. L. R. 1167.
[3] See, 3 Williston, Contracts (Rev. ed.) § 677; Gosline v. Prince Macaroni Mfg. Co. 241 Mass. 550, 135 N. E. 686.

14

goods as not conforming to the contract he must give plaintiff an opportunity to deliver in accordance with the contract. The Vassau case is also distinguishable in that in that case there was an attempted delivery of chattels which did not conform to the contract. In the case now before us, plaintiff was given no chance to deliver the sweet corn at all. These cases clearly are not in point and are of no help to defendant.

We find no reversible error. In view of our decision on this issue, it is not necessary to discuss the other points raised by defendant.

Affirmed.